IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,       )
                                )
    v.                          )
                                )    1:11cr231   (LMB)
MARION SHAWN ANDERSON,          )    1:12cv1168  (LMB)
                                )    1:14cv126   (LMB)
    Defendant.                  )

MEMORANDUM OPINION

Marion Shawn Anderson ("Anderson"), a federal prisoner
confined at Federal Correctional Institution ("FCI") Allenwood
in White Deer, Pennsylvania, has filed his second pro se Motion
Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence
by a Person in Federal Custody ("Motion to Vacate") [Dkt. No.
128].[1]

Read generously, Anderson's motion appears to raise four
issues.  First, he contends that he is factually and actually
innocent of the charge to which he pleaded guilty.  Second, he
alleges that his guilty plea was coerced through misconduct by
the government and the incompetence of his counsel.  Third, he
claims the prosecutor violated the plea agreement by failing to
file a motion for a sentence reduction in light of his
cooperation.  Finally, he argues that the Court erred when it
included a two-level enhancement for possession of a firearm in

---

[1] Giving Anderson the benefit of the doubt, and for the reasons
discussed infra in the procedural history, the Court will not
construe this motion as successive under 28 U.S.C. § 2255(h).



calculating the appropriate Offense Level.  See Mem. of Law in

Supp. of Movant's Pro Se Mot. to Vacate, Set Aside or Correct a

Fed. Sentence or Conviction Pursuant to 28 U.S.C. § 2255

("Movant's Mem.") at 5, 19-21 [Dkt. No. 129].  Anderson seeks an

evidentiary hearing to prove his allegations.  For the reasons

that follow, the Motion to Vacate will be summarily dismissed.[2]

## I.   FACTUAL BACKGROUND[3]

On February 14, 2011, a Virginia State Trooper pulled over

an individual — who later became a confidential source ("C.S.")

— for a routine traffic violation.  See Statement of Facts ¶ 3

[Dkt. No. 61].  The C.S. consented to a search of his rental

car, in the trunk of which the Trooper found approximately 1.75

kilograms of cocaine.  Id.  During a subsequent interview with

the police, the C.S. stated that he had purchased the cocaine

from "Shawn," later identified as Anderson, and that the full

---

[2] Under Rule 4(b) of the Rules Governing Section 2255 Proceedings
for the United States District Courts:

> The judge who receives notice of the motion must
> promptly examine it.  If it plainly appears from the
> motion, any attached exhibits, and the record of prior
> proceedings that the moving party is not entitled to
> relief, the judge must dismiss the motion and direct the
> clerk to notify the moving party.

[3] The factual background provided in this section is based on the
affidavit filed by the government in support of its criminal
complaint [Dkt. No. 3] and the Statement of Facts incorporated
in Anderson's plea agreement [Dkt. No. 61], which Anderson
signed and affirmed as accurate under penalty of perjury.  Plea
Hr'g Tr., 25:7-27:24 [Dkt. No. 93].

purchase price was $59,000.00.  Id. ¶ 4.  The C.S. further
stated that he had paid $54,300.00 in cash up front to "Tay," a
black female, later identified as Atavia Mack ("Mack"), who was
acting on behalf of Anderson in delivering the cocaine and
accepting the cash in exchange, and that he still owed Anderson
$4,700.00 for the seized cocaine.  Id.  The C.S. described how
he would travel to Baltimore every two weeks to purchase at
least one-half of a kilogram of cocaine from Anderson, and then
return to Suffolk, Virginia, where he sold it to his customers.
Id. ¶ 5.  The amount of cocaine per transaction had been
steadily increasing, and the C.S. estimated that over the course
of a year he had purchased approximately fifteen kilograms of
cocaine from Anderson.  Id.

　　The C.S. provided agents with the telephone numbers that he
called to discuss cocaine transactions with Anderson.  Id. ¶ 7.
He also told agents that Anderson gave him an account number and
other information related to a Bank of America account in calls
and text messages using those telephone numbers.  Id.  After his
interview, at the direction of law enforcement, the C.S. placed
a recorded phone call to Anderson at one of the aforementioned
numbers, in which they discussed the quality of the drugs the
C.S. had been purchasing from Anderson, and made arrangements
for a future cocaine transaction.  Id. ¶ 6.

3

On February 17, 2011, Anderson instructed the C.S., in a series of recorded phone calls and text messages, to deposit the remaining $4,700.00 into the Bank of America account the C.S. had identified.  Id. ¶ 8.  Undercover agents deposited $4,700.00 in DEA funds into that account.  Id.  The C.S. confirmed the deposit in a recorded telephone call to Anderson.  Id.

Anderson sent a text message to the C.S. on March 1, 2011, stating that he could sell the C.S. 1.5 kilograms of cocaine for $51,000.00.  Id. ¶ 10.  The C.S. told Anderson that he would purchase all of it, and that he would be in the Baltimore area to pick it up on March 3, 2011.  Id.  Throughout the morning of March 3, 2011, the C.S. and Anderson exchanged text messages to finalize details of the transaction, which was to be made at the Spring Hill Suites Hotel in Hanover, Maryland.  Id. ¶ 11. Later, Anderson called the C.S. to inform him that Mack was on her way to the hotel.  Id.  Law enforcement set up video surveillance and observed Mack delivering 1.5 kilograms of cocaine to the C.S.  Id.  Mack was then arrested.[4]  Id.

During Mack's post-arrest interview, she stated that Anderson paid her $200.00 for each delivery she made to the C.S. and provided her with a car to use.  Id. ¶ 12.  She further stated that she had made six earlier deliveries to the C.S. for

---

[4] On May 3, 2011, Mack pleaded guilty to conspiracy to distribute five kilograms or more of cocaine and was sentenced on August 19, 2011.  See Criminal Case No. 1:11cr201 (AJT).

Anderson, which totaled approximately six kilograms of cocaine.
Id.  Anderson was arrested shortly thereafter outside of his
home, where he was found sitting in an SUV with Brandon Tyree
Thomas.  During a search of the SUV agents found $30,020.00 in
cash; and they recovered $101,940.00 in cash and a loaded
shotgun from his residence.

## II.  PROCEDURAL BACKGROUND

Anderson was charged with conspiracy to distribute five
kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846
and 841(a)(1).  See Criminal Compl. [Dkt. No. 1].  At his
initial appearance on March 4, 2011, Anderson indicated that he
had retained counsel, John Katz.  See Minute Entry [Dkt. No. 7].
At two later appearances, however, Anderson indicated that he
and his family had not been able to finalize arrangements with
counsel, although they were trying to do so.  On March 14, 2011,
Todd A. Pilot entered a Notice of Appearance on behalf of
Anderson [Dkt. No. 23], and on April 19, 2011, Pilot
successfully moved the admission of Ivan Jules Bates pro hac
vice [Dkt. No. 32].

On May 12, 2011, Anderson was indicted on one count of
conspiracy to distribute five kilograms or more of a mixture and
substance containing a detectable amount of cocaine, in
violation of 21 U.S.C. §§ 846 and 841(a)(1).  See Indictment
[Dkt. No. 39].  The indictment was accompanied by a Forfeiture

Notice under 21 U.S.C. § 853, which included the cash seized from the SUV and Anderson's residence, a Cadillac SUV, a Lexus sedan, and "a sum of money equal to approximately $442,000.00 in United States currency, representing the proceeds obtained as a result of the offense charged." Id. at 5.

On May 27, 2011, Anderson moved to relieve Pilot and Bates of responsibility for his defense and to substitute another retained attorney, Anton J. Stelly, as counsel, see Mot. of Substitution of Counsel [Dkt. No. 44], which the Court granted on May 31, 2011, see Order [Dkt. No. 46]. Acting on behalf of Anderson, Stelly filed a Motion to Suppress Evidence [Dkt. No. 45], which was originally to be heard on July 15, 2011; however, the motion hearing was continued until July 29, 2011. On July 26, 2011, the government filed a § 851 information. On the next day, July 27, 2011, which was two days before the scheduled hearing for the motion to suppress, Anderson pleaded guilty to the conspiracy count pursuant to a written plea agreement. See Plea Agreement [Dkt. No. 60].

During the Rule 11 colloquy, Anderson stated under an affirmation to tell the truth that he was thirty-eight years old, had completed his GED, and had no problem reading, writing, understanding, or speaking English. Plea Hr'g Tr., 3:4-10 [Dkt. No. 93]. He further acknowledged that he had taken no medication and was not under the influence of alcohol or drugs

6

at the time. Id. at 3:23-4:4. Anderson agreed that he had had "several days, if not weeks," to review the written plea agreement on his own, and that he had also reviewed it with Stelly, who had answered all of his questions about the agreement to his satisfaction. Id. at 5:3-14. Anderson also affirmed that he was "fully satisfied with the way [Stelly] ha[d] been working with [him] on this case," that he understood the contents of the agreement and had voluntarily entered into it, and that no one had put "any force or pressure" on him to plead guilty. Id. at 5:25-6:12, 21:7-9, 24:22-24. The Court therefore found that Anderson entered his plea knowingly and voluntarily.

After the plea hearing, but before the scheduled sentencing hearing, Anderson sent the Court a letter complaining about the quality of representation he had been receiving from Stelly. See Mot. to Appoint Counsel [Dkt. No. 73]. His principal complaint was that Stelly had been taking pain medication for back problems and, as a result, seemed "lost," would forget what Anderson told him, and had neglected to perform certain duties. Id. at 1. Specifically, Anderson stated that he had instructed Stelly to file some pretrial motions that were never filed, and that Anderson still had "major questions about the indictment, Grand Jury Minutes, Criminal Complaint, Criminal Cover Sheet,

and more," none of which were answered.[5]  Id.   The Court treated

the letter as a Motion for Court-Appointed Counsel [Dkt. No.

73], which it then denied [Dkt. No. 74].

Anderson sent the Court another letter complaining about

Stelly [Dkt. No. 76].  This letter reiterated Anderson's earlier

complaint about Stelly taking pain medication and added

complaints about how Stelly handled the motion to suppress

evidence and Stelly's purported lack of response to the

Presentence Investigation Report ("PSR") and failure to file a

Sentencing Memorandum.[6]  In response to Anderson's second letter,

the Court held a hearing to address his complaints.  See Order

[Dkt. No. 75].  At that hearing, the Court relieved Stelly of

any further obligations, finding that the attorney-client

relationship had become too adversarial, and appointed Robert L.

Jenkins, Jr., Esq., to represent Anderson.  See Order [Dkt. No.

79].

Jenkins served as defense counsel during the sentencing

hearing on November 18, 2011, when the Court sentenced Anderson

to the mandatory minimum of 240 months in the custody of the

---

[5] Anderson's allegations in this respect directly contradict his
acknowledgment during the plea colloquy that he had asked
counsel all the questions he had about the case and that counsel
had answered all of those questions to his satisfaction.  Plea
Hr'g Tr., at 5:9-14.
[6] In fact, on October 3, 2011, the same day that this second
letter was received and filed, Stelly filed several objections
to the Presentence Investigation Report.  See Def.'s Objections
to Presentence Investigative Report [Dkt. No. 77].

Bureau of Prisons, followed by ten years of supervised release.
See Judgment [Dkt. No. 89].  No notice of appeal was filed.

On October 18, 2012, Anderson timely filed his first Motion
to Vacate [Dkt. No. 96], in which he argued that his counsel was
ineffective for failing (1) to file a timely Notice of Appeal
after being instructed to do so, (2) to challenge the
government's alleged breach of the plea agreement, (3) to
challenge his "coerced" plea, (4) to pursue a "promised" Rule 35
motion, (5) to challenge the drug quantity used either for the
offense of conviction or for calculating the Guidelines, (6) to
adequately challenge the leadership role sentencing enhancement,
(7) to succeed in challenging the gun enhancement, (8) to
challenge the forfeiture order, and (9) to challenge the § 851
criminal information.  See Mem. of Law in Supp. of Movant's Pro
Se Mot. to Vacate ("First Mem."), 6-7 [Dkt. No. 97].  On
November 23, 2012, just within the one-year time period for
filing a § 2255 motion, Anderson submitted an Amended Memorandum
[Dkt. No. 100], which added a tenth point of error, claiming
that his counsel was ineffective "for failing to challenge [sic]
validity of the affidavit used by law enforcement to secure
search warrant."[7]  In the Amended Memorandum, Anderson also

---

[7] There was no search warrant in this case.  The search of
Anderson's residence was by consent; the searches of Anderson's
person and his vehicle were incident to his arrest.

appeared to argue that he was actually innocent, although that issue was not presented as a separate, enumerated claim.

On December 3, 2012, the Court summarily dismissed all of Anderson's claims except for the claim that Robert Jenkins, his counsel at the time of sentencing, had failed to file a timely Notice of Appeal after Anderson asked him to do so. See Order [Dkt. No. 114]. Giving Anderson the benefit of the doubt, the Court granted that one claim and, pursuant to the procedure required in the Fourth Circuit, vacated the conviction entered on November 18, 2011, and reimposed it, thereby allowing Anderson the ability to file a Notice of Appeal, see id., which he did with the assistance of new counsel.

Other than the claim of factual innocence, it appears the Fourth Circuit may have already rejected all of the claims in the pending Motion to Vacate. According to its per curiam decision [Dkt. No. 125], Anderson alleged ineffective assistance based on his counsel's false assurances about the sentence and misleading advice and, contended as he does here, that he was coerced by the government and his counsel into pleading guilty. Specifically, Anderson alleged that the government acted coercively by conditioning any plea on withdrawal of the suppression motion, promising not to file for increased statutory sentencing, and representing that it would move to reduce his sentence by 65 percent. Counsel acted coercively by

10

allegedly telling Anderson his guidelines would be 97-121
months.  Anderson further argued that the government violated
the plea agreement by filing a § 851 notice, not agreeing to a
total offense level of 29, and failing to file a downward
departure motion.  The Fourth Circuit declined to consider the
ineffective assistance of counsel claim, ruling that "the record
in this instance falls far short of supporting Anderson's . . .
claim," and concluded that "there was no breach of any kind [of
the plea agreement] by the government."  United States v.
Anderson, 539 F. App'x 107, 108 (4th Cir. 2013).  Finding no
error, the Fourth Circuit affirmed Anderson's conviction and
sentence.  Id.  Anderson timely filed his Motion to Vacate.

III.  DISCUSSION

**A. Standard of Review**

A motion to vacate under 28 U.S.C. § 2255 provides for
collateral attack on a conviction or sentence when the
conviction or sentence was imposed in violation of the United
States Constitution or laws, when the court lacked jurisdiction
to impose the sentence, when the sentence was in excess of the
maximum authorized by law, or when the conviction or sentence is
otherwise subject to a collateral attack.  See 28 U.S.C.
§ 2255(a).  To prevail on a § 2255 motion, a movant bears the
burden of proving his grounds for collateral relief by a

11

preponderance of the evidence.  See Jacobs v. United States, 350 F.2d 571, 574 (4th Cir. 1965).

Relief under § 2255 is designed to correct for fundamental constitutional, jurisdictional, or other errors, and it is therefore reserved for situations in which failing to grant relief would be "inconsistent with the rudimentary demands of fair procedure or constitute[] a complete miscarriage of justice." United States v. Vonn, 535 U.S. 55, 64 (2002) (quoting United States v. Timmreck, 441 U.S. 780, 783 (1979)). A § 2255 motion "may not do service for an appeal," and claims that have been waived are therefore procedurally defaulted unless the movant can show cause and actual prejudice. United States v. Frady, 456 U.S. 152, 165-67 (1982).  An exception applies, however, when a defendant brings a claim of constitutionally ineffective assistance of counsel. See United States v. Gastiaburo, 16 F.3d 582, 590 (4th Cir. 1994).

Under § 2255(b), a movant is to be granted an evidentiary hearing on his motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  Summary dismissal of § 2255 allegations is "warranted only if a habeas petitioner's allegations when viewed against the record of the plea hearing are palpably incredible or patently frivolous or false." United States v. White, 366 F.3d 291, 297 (4th Cir. 2004) (quoting Blackledge v.

12

Allison, 431 U.S. 63, 76 (1977)).  Because a § 2255 motion "is ordinarily presented to the judge who presided at the original conviction and sentencing of the prisoner," that judge may take into account her "recollection of the events at issue" when deciding whether to summarily dismiss it.  See Blackledge, 431 U.S. at 74 n.4.

## B. Actual Innocence

To succeed on a post-conviction claim of actual innocence, a movant must establish that a reasonable juror viewing new and reliable evidence in light of the entire record would more likely than not have not found the movant guilty beyond a reasonable doubt.  Schlup v. Delo, 513 U.S. 298 (1995).  In support of his claim, Anderson has submitted a timeline for the morning of March 3, 2011, and various witness statements; however, none of the statements are notarized nor are they made under the penalty of perjury.  Pointing to statements from Latosha Whitener, the mother of Anderson's child, with whom he was living when he was arrested, and the other exhibits, Anderson argues that from 7:34 a.m. on March 3, 2011, to the time he was arrested at his home, he was performing errands, which included delivering his children to daycare and dropping Whitener off to work, and therefore could not have been involved in arranging the cocaine delivery to the C.S.  The first problem with this evidence is that it lacks any reliability, given that

it is neither notarized nor made under the penalty of perjury.

Second, in no way does this purportedly new evidence undercut

the existing, overwhelming evidence of guilt in the record,

including defendant's signature on the Statement of Facts, in

which he admitted to being a member of the charged conspiracy;

his oral admissions made under an affirmation to tell the truth

during his Rule 11 colloquy; his admission to the Probation

Officer during preparation of the PSR that he was a member of a

conspiracy to distribute cocaine; the lack of any reference to

innocence in his letters to the Court before the sentencing

hearing; and his failure to contest the facts or his guilt when

he allocuted at the sentencing hearing.

Moreover, nothing in the submitted statements is

inconsistent with what Mack and the C.S. told the agents.  As

reflected in Special Agent Kelly's affidavit in support of the

criminal complaint, the C.S. sent a text message to Anderson

around 7:25 a.m. to arrange for a purchase of 1.5 kilograms of

cocaine for $51,000, and the two thereafter texted back and

forth between 7:25 a.m. and 8:56 a.m., during which time they

arranged for the C.S. to pick up the cocaine at the Spring Hill

Suites Hotel in Hanover, Maryland.  At 8:56 a.m., Anderson

called the C.S., told him "she's on the way," and at 10:17 a.m.,

the C.S. met Atavia Mack at the Spring Hill Suites Hotel where

she delivered 1.5 kilograms of cocaine.  Upon arrest, Mack

14

explained that she had met Anderson earlier that morning in
Baltimore, where he gave her the 1.5 kilograms and told her to
go to the Spring Hill Suites Hotel, deliver it to the C.W. and
collect $51,000, which she was to return to Anderson.  Mack also
told the agents that Anderson was in the company of a person,
identified as Brandon Tyree Thomas when she picked up the
cocaine from Anderson, and that she had previously met Thomas
when he was selling cocaine with Anderson.

Anderson's timeline is therefore not inconsistent with the
information provided by Mack and the C.S.  Clearly, Anderson
could be texting the C.S. while running errands.  In addition,
Mack's statement was that she met with Anderson in the morning.
Because she does not specify a time, nothing in the record
suggests that Mack did not meet Anderson before he left his home
at 7:34 a.m.  Moreover, if Mack's statements were fabricated,
how would she have known that Thomas was with Anderson that day?
Lastly, the DEA report attached to Anderson's memorandum as an
exhibit reflects that among the five cellular phones seized from
Anderson's person on March 3, 2011, was a phone with the number
(202) 407-2850.  That was the same number the C.S. dialed on
February 17, 2011, to contact Anderson to arrange for paying the
$4,700 he owed for an earlier drug purchase.

Given the overwhelming evidence of Anderson's guilt in the
record and Anderson's failure to produce any reliable new

evidence to the contrary, his claim of actual innocence is without merit.  See Schlup, 513 U.S. 298.

## C. **Ineffective Assistance of Counsel & Coerced Guilty Plea**

To establish ineffective assistance of counsel, Anderson must show both that (1) "counsel's performance was deficient" and that (2) "the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687 (1984).  Deficient performance occurs when "counsel's representation fell below an objective standard of reasonableness."  Id. at 688.  A movant can show prejudice when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A showing that "the errors had some conceivable effect on the outcome of the proceeding" is not enough; a reasonable probability requires that the errors are "sufficient to undermine confidence in the outcome."  Id. at 693, 694.

Anderson argues that his guilty plea was not knowingly and voluntarily made, but was instead the result of the ineffectiveness of his counsel and coercion by the government. Specifically, Anderson alleges that the government conditioned the plea on his agreement to withdraw his motion to suppress, and that counsel allowed this coercion to happen.  He further alleges that the prosecutor told him his total offense level would be 29 after a three-point reduction for acceptance of

16

responsibility, resulting in a guideline range of 97-121 months;
that she told him she had seen defendants get as much as a two-
thirds sentence reduction for cooperation; and that "he was told
there would be no gun or leadership enhancements, and neither
the government nor his attorney ever explained or discussed a
mandatory minimum 20 years sentence because of assurances that
there would be no § 851 Notice filed."  Movant's Mem., at 20.

Anderson's admissions during his Rule 11 colloquy, all made
under the penalty of perjury, completely undercut these claims.
Most importantly, in his Rule 11 colloquy, when asked by the
Court whether "anyone put any force or pressure on [him] to
plead guilty," Anderson answered "no."

To avoid the obvious result from his admissions, Anderson
cites Machibroda v. United States, 368 U.S. 487 (1962), and
Fontaine v. United States, 411 U.S. 213, 214 (1973) (per
curiam), for the proposition that the Court cannot adopt a "per
se rule excluding all possibility that Anderson's
representations during his guilty plea were not the product of
factors such as misunderstanding, duress, or misrepresentation
by others so as to make his guilty plea a constitutionally
inadequate basis for the sentence imposed and resulting
imprisonment."  Movant's Mem., at 9.

Machibroda and Fontaine are inapposite.  In both cases, the
Supreme Court found that the defendants had sufficiently alleged

17

acts of coercion to entitle them to evidentiary hearings on the issue. Although those cases did reject such a per se rule, neither case "in the least reduce[d] the force of the original plea hearing." Blackledge v. Allison, 431 U.S. 63, 67 (1977). As the Supreme Court clarified in Blackledge:

> [T]he representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

Id. at 73-74. Similarly, under Fourth Circuit precedent, a movant's statements at a plea hearing "that facially demonstrate the validity of his plea are conclusive unless he presents any reasons why this should not be so." Via v. Superintendent, Powhatan Corr. Ctr., 643 F. 2d 167, 171 (4th Cir. 1981); see also Nesbitt v. United States, 773 F. Supp. 795, 799 (E.D. Va. 1991) ("Sworn responses in a plea proceeding are conclusive unless the movant can demonstrate compelling reasons for questioning their truth, such as ineffective assistance of counsel.").

In particular, when a plea bargain is "favorable" to the movant, such that "accepting it was a reasonable and prudent decision," those facts constitute evidence of the

18

"voluntary and intelligent character" of the plea.  <u>Fields</u>

<u>v. Attorney Gen. of State of Md.</u>, 956 F.2d 1290, 1299 (4th

Cir. 1992).  They also support the conclusion that counsel

was effective in blessing Anderson's decision to plead

guilty, and that Anderson suffered no prejudice from that

advice.

In this case, the record clearly shows that Anderson

received a significant benefit from the plea agreement

because he avoided the imposition of a mandatory life

sentence.  Anderson's significant criminal history included

three prior felony drug convictions.[8]  Accordingly, had the

government filed § 851 informations for more than one

conviction, Anderson would have faced a mandatory minimum

of life imprisonment.  Although he has alleged that the

government's pressure, combined with his counsel's

ineffective assistance, led him to enter into a coerced

plea, his allegations are not sufficient to surmount either

---

[8] They are: (1) a 1998 conviction in the United States District
Court for the District of Maryland for Conspiracy to Distribute
Cocaine, for which movant received a sentence of 77 months of
incarceration; (2) a 1992 conviction in the Circuit Court for
Baltimore City, Maryland, for Possession with Intent to
Distribute Cocaine, for which movant received a sentence of 16
years of incarceration (half of which was suspended); and (3) a
1991 conviction in the Circuit Court for Baltimore City,
Maryland, for Possession with Intent to Distribute Cocaine, for
which movant received a sentence of 5 years of incarceration
(the majority of which was suspended).  <u>See</u> PSR ¶¶ 44, 45, 48
[Dkt. No. 83].

"the formidable barrier created by his in-court representations" or the magnitude of the benefits he received from pleading guilty rather than going to trial. Nesbitt, 773 F. Supp. at 799.

Moreover, a plea agreement is not coerced simply because the government told defense counsel that the offer would be withdrawn if the defense continued with a suppression hearing.  It is inherent in the nature of plea bargaining that the government has an interest in convincing the defendant and his counsel to waive certain rights, the exercise of which would require the government to incur additional costs.  Cf. Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978) ("[A]cceptance of the basic legitimacy of plea bargaining necessarily implies rejection of any notion that a guilty plea is involuntary in a constitutional sense simply because it is the end result of the bargaining process.").  Although the choices imposed during the bargaining process "clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable' — and permissible — 'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.'"  Id. at 364 (quoting Chaffin v. Stynchcombe, 412 U.S. 17, 31 (1973)).  Because Anderson

remained "free to accept or reject the prosecution's offer," id. at 363, that the government conditioned the offer on the withdrawal of Anderson's motion to suppress does not mean the agreement ultimately reached was coerced.

Any argument that the prosecutor told Anderson he would receive a lighter sentence by pleading guilty cannot support a motion to vacate because both the written agreement and the Court's questions during the Rule 11 colloquy made clear to Anderson that any statements about his sentence from either defense counsel or the prosecution would not bind the Court:

> THE COURT:  I want to make sure you understand that no matter what is written in paragraph 5 of the plea agreement and no matter what Mr. Stelly may have told you he believes your sentence will be or what he expects your guidelines to be or, for that matter, if the prosecutor, Ms. Eriksen, or anybody else, any agent or any friend or anybody has told you, "oh, you're probably going to get X, Y, or Z punishment," none of those discussions in any respect bind or limit the probation officer who prepares the presentence report or this Court when it goes to sentence you.
>
> Do you understand that?
>
> THE DEFENDANT:  Yes.
>
> Plea Hr'g Tr., 14:18-15:13; see also Plea Agreement

¶ 5(c).

Anderson's allegation that the government promised not to seek a gun enhancement is similarly contradicted by both the written agreement and the course of the Rule 11

colloquy, in which the Court explained that defense

counsel and the government remained free to argue for any

sentence reductions or enhancements that could be applied

to the base offense level of 32:

> THE COURT:  All right.  And paragraph 5(c) provides
> that you understand that those stipulations in 5(a)
> and 5(b) are not in any respect binding either on the
> Probation Office or the Court and that there's no
> agreement between you-all as to any other guideline
> factors.  That means, for example, that you are free
> to argue that you should get a minimal role reduction.
> The government can argue that you should get a
> leadership role.  In other words, there are no other
> guideline factors that either of you have agreed to.
>
>      Is that your understanding of the plea agreement?
>
> THE DEFENDANT:  Yes.

Plea Hr'g Tr., 11:16-12:1; see also Plea Agreement ¶ 5(c).

Anderson therefore entered his guilty plea fully informed

of the fact that any representations made to him regarding

various sentencing enhancements would not be binding on the

Court.

Anderson also alleges that the government broke a

promise not to file a § 851 information.  Movant's Mem.,

20.  He made the same argument in both his first § 2255 and

on appeal and it was rejected by this Court and the Fourth

Circuit because the record unequivocally establishes that,

contrary to Anderson's claim that he was unaware of the

filing until he appeared in court to plead, he was on

22

notice well before he entered his guilty plea that a § 851
information alleging only one prior conviction for a felony
drug offense would be filed.  Indeed, the written plea
agreement specifically provided that the government would
"file only one criminal information with the Court,
pursuant to Title 21, United States Code, Section 851,
stating one of the defendant's prior convictions for a
felony drug offense."  Plea Agreement ¶ 10.

During the Rule 11 plea colloquy, the Court and the
attorneys present told Anderson several times that a § 851
information had been filed against him alleging only one
felony drug conviction, and he acknowledged that he
understood that aspect of the plea agreement.  For example,
the Court explained the impact that the § 851 information
had on his mandatory minimum sentence:

> THE COURT:  . . .  Now, because the government has filed
> an 851 information against you, which indicates that you
> have at least one felony drug conviction on your record
> . . . that doubled the mandatory minimum sentence that
> you're looking at in this case, and so, in fact, you're
> now – the sentence that you're looking at is a mandatory
> minimum of 20 years in prison up to the possibility of
> life in prison.
>
> Do you understand that?
>
> THE DEFENDANT:  Yes.

Plea Hr'g Tr., 7:21-8:5.  In addition, the Court and
counsel discussed the other felony convictions for which

23

§ 851 informations could have been filed, as well as the
benefit Anderson received from the government's promise in
the plea agreement to file only one:

> THE COURT:  Now, in exchange for your guilty plea
> today, the first thing the government has done is, No.
> 1, in paragraph 10, has agreed that it will file only
> one criminal information under 851 concerning your
> record.  We've already discussed that.
>
>     And had they filed all of the information[s],
> then is it correct, Ms. Eriksen, that that would have
> been a mandatory life sentence?
>
> MS. ERIKSEN:  Yes, Your Honor.
>
> THE COURT:  All right.  So they have given you that
> benefit . . . .
>
>     Do you understand?
>
> THE DEFENDANT:  Yes.

Id. at 16:6-21; see also id. at 13:3-14:3 (discussion
between defense counsel, the government, and the Court of
the possibility of a mandatory minimum life sentence).

Finally, Exhibit 5 to Anderson's memorandum in support
of his first § 2255 motion demonstrates that before he
entered his plea, he was fully aware that a § 851
information would be filed against him.  On July 18, 2011,
more than a week before the § 851 information was filed and
the plea hearing was held, his fiancée, Latosha Whitener,
wrote an e-mail to Stelly on behalf of Anderson, stating
that they "needed[ed] clarification on the filing of one

24

criminal conviction under 851" and whether "that [would] enhance his criminal category over Level 32[.]"  See Movant's First Mem., Ex. 5.  The nature of Whitener's question clearly indicates that she and Anderson were aware that the government would be filing a criminal information under § 851.  And Stelly's response makes similarly clear that he had informed Anderson of the consequences if the government decided to file more than one § 851 information:

> No.    In  fact,  by  not  mentioning  the  3  prior
> convictions (2 state – that may not count because they
> are so long ago – and the MD federal conviction), the
> AUSA [ ] is trying to help him out.  As I've tried to
> explain  to  [Anderson]  if  he  is  convicted  with  more
> than  one  prior,  it[']s  MANDATORY  MINIMUM  life  in
> prison.

Id.  This response leaves little doubt that Stelly had been communicating with Anderson about the impact citing to multiple felony drug convictions a § 851 information would have on his sentence and fully undercuts Anderson's argument that counsel was ineffective or that the plea was unknowing, involuntary, or coerced.

**D.   The Gun Enhancement**

Anderson's last argument — that the Court erred in allowing a gun enhancement to remain in calculating his total offense level — fails for multiple reasons, including that it is procedurally barred because it was not raised on appeal, and that it is not the type of error cognizable in

25

a motion to vacate because it does not constitute a fundamental defect in his conviction.  See Vonn, 535 U.S. at 64.  Lastly, given that Anderson faced a mandatory minimum sentence of 240 months, the inclusion of the two-level firearm enhancement had no material impact on his sentence.

### III.   CONCLUSION

For all these reasons, Anderson's Motion to Vacate [Dkt. No. 128] will be dismissed by an Order to issue with this Memorandum Opinion.

Entered this 7th day of May, 2014.

Alexandria, Virginia

_/s/_

Leonie M. Brinkema
United States District Judge